**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER WALTHORN,

Plaintiff,

v.

LOGISTICS INSIGHT CORP.,

Defendant.

Case No. 26cv-10887

Hon. David M. Lawson

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 847-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Eric J. Pelton (P40635)
Thomas J. Davis (P78626)
KIENBAUM HARDY
VIVIANO PELTON & FORREST,
PL.C.
*Attorneys for Defendant*
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
tdavis@khvpf.com

There is no other pending or resolved civil action arising out of this transaction or occurrence alleged in the Amended Complaint

**AMEENDED COMPLAINT AND JURY DEMAND**

Plaintiff Jennifer Walthorn ("Plaintiff"), by and through her attorneys, HURWITZ LAW PLLC, brings this action against Defendant Logistics Insight Corp. ("Defendant") and hereby alleges as follows:

## INTRODUCTION

1. From September 2023 through June 19, 2025, Plaintiff worked as a switcher for Defendant at its facility in Ypsilanti, Michigan. Throughout her employment, she excelled at her job and received consistent praise from management and client representatives. Despite her exemplary performance, Plaintiff endured relentless sex-based harassment from male drivers and male colleagues who treated her fundamentally differently because she is a woman. Male drivers routinely cursed at her, ignored her instructions, and subjected her to sexually degrading conduct. When she reported this harassment, Defendant's managers either ignored her complaints entirely or told her to modify her own behavior to avoid angering male employees. The harassment escalated until May 20, 2025, when Plaintiff was sexually assaulted by a driver who forcibly embarrassed her and caressed her body against her will. Plaintiff reported the assault and identified the exact time and location where security cameras captured the incident. Defendant took no action. When the same driver returned to the facility, Plaintiff was instructed to hide rather than being protected. On June 18, 2025, after nearly two years of documented complaints falling on deaf ears, Plaintiff sent a detailed email to management describing the ongoing harassment, disparate treatment, and sexual assault. The next morning, she received a phone call from Human Resources. Hours later, she was terminated. Defendant's systematic failure to protect Plaintiff from a

hostile work environment, its discriminatory treatment of her based on sex, and its retaliatory termination violated Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act.

**PARTIES, JURISDICTION, AND VENUE**

2. This is an action alleging sex discrimination, hostile work environment based on sex, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101 *et seq*.

3. Plaintiff is an individual residing in Lansing, Clinton County, Michigan.

4. Defendant is a Michigan domestic profit corporation with a registered office located in Warren, Macomb County, Michigan, and doing business throughout the Eastern District of Michigan.

4. This Court has jurisdiction over this proceeding pursuant to 42 U.S.C. § 2000e-5 (Title VII of the Civil Rights Act), 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction over state law claims).

5. Venue in this Court is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events and omissions giving rise to this Amended Complaint occurred within this judicial district in Ypsilanti, Washtenaw County, Michigan.

6. Plaintiff filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 21, 2025, alleging discrimination on the basis of sex and retaliation.

7. Plaintiff received her Notice of Right to Sue from the EEOC on March 5, 2026.

## STATEMENT OF FACTS

### Plaintiff's Employment and Early Harassment

10. Defendant hired Plaintiff in September 2023 as a Switcher stationed at the General Motors ("GM") facility Plant 87 located in Ypsilanti, Michigan.

11. As a Switcher, Plaintiff was responsible for moving trailers within the truck yard, enforcing safety protocols, and assisting drivers with compliance requirements established by GM and logistics company RXO.

12. Plaintiff performed her duties exceptionally well. Management at Defendant, GM, and RXO consistently praised her work performance.

13. Manager Brian Ciak told Plaintiff in text messages that he had "Received nothing but praise from all of the GM/RXO people" he had spoken with and called her "a fantastic switcher."

14. Despite her excellent performance, within only a few months of her employment, Plaintiff began experiencing pervasive harassment from male drivers

based on her sex. Male drivers routinely told Plaintiff to "fuck off" and called her a "bitch" when she enforced safety protocols or provided instructions.

15. On one occasion during late 2023, a male driver took his shirt off and pushed his bare chest directly into Plaintiff's face while screaming and beating his chest. The driver did this, in his own words, to prove what a "big man" he was. This occurred after the driver had been upset about receiving directions from Plaintiff's male colleague Anthony Marbury, and the driver specifically targeted Plaintiff because she was female.

16. These male drivers would routinely ignore Plaintiff's instruction and directions because of her sex. At least one drive explicitly stated that Plaintiff, as a woman, had no right to speak to him.

17. The harassment would only cease when Plaintiff's male colleagues intervened on her behalf. Male drivers who refused to comply with Plaintiff's instructions would immediately comply when given the same instructions by her male colleagues.

18. Defendant regularly assigned Plaintiff to work alone in the dark, remote parts of the truck yard where she could not be seen by others and where she struggled to call for help if threatened.

**December 2023 Complaint and Defendant's Failure to Act**

19. On or about December 1, 2023, Plaintiff sent her first formal written complaint to her manager, Mr. Ciak, via text message. She explained that she was "continually being harassed by outside drivers" and specifically stated that she felt "unsafe because of the harassment." She described being told to "fuck off" and being called a "bitch" that very day. She detailed the incident where a male driver had removed his shirt and pushed his bare chest into her face while beating his chest, explaining "it was my understanding that because I was a female, I was an easy target to prove that to."

20. Plaintiff further explained that male drivers would directly ignore her when she reminded them of safety protocols, forcing her to seek help from male colleague Anthony Marbury to get drivers to listen and comply. She expressed concern that "when I do have to get Anthony, security or GM involved[,] I feel comes across in a negative light on me as if having a female driver in this position is a problem."

21. Mr. Ciak responded that same evening, acknowledging her complaint and stating: "I think you are a fantastic switcher. I have received nothing but praise from all of the GM/RXO people I have spoken with. I will get with my boss and HR and together we can come up with a solution. I definitely want you to be in a safe environment."

22. Despite Mr. Ciak's explicit promise to work with Human Resources to create a safe environment for Plaintiff, Defendant took no action whatsoever to prevent or remedy the harassment. No one from Human Resources or management ever followed up with Plaintiff about her December 1, 2023 complaint.

23. The harassment continued unabated.

**January 2024 Sex Offender Complaint and Management's Silence**

24. In January 2024, Plaintiff learned that one of the drivers with whom she was required to work had previously been convicted and imprisoned for sexual crimes against women. The driver had been sentenced to 3-20 years in prison, with the prosecutor noting "three previous felonies and 10 misdemeanors on his record."

25. On January 5, 2024, RXO directed Plaintiff to handle a situation involving the aforementioned driver, who had dropped his trailer in an unapproved spot and was attempting to force Plaintiff to retrieve a new trailer for him.

26. Upon learning this driver had previously been convicted and imprisoned for sexual crimes against women, Plaintiff sent a text message to Mr. Ciak with a link to a news article about the driver's criminal conviction and wrote: "I really don't feel like I am in a safe position, prepared or trained to properly defend myself from individuals like this. Especially when I'm alone, in the dark and far away from any help."

27. Mr. Ciak never responded to Plaintiff's text message expressing fear for her safety. Defendant took no action to protect Plaintiff, and she continued to be required to work alone with this driver and others in dark, remote areas of the yard.

**March 2024 Harassment and Sex-Based Work Restrictions**

28. In March 2024, Plaintiff was performing her job duties by reporting safety issued with a particular truck to Roadside Assistance, as required by company protocol and federal Department of Transportation ("DOT") regulations.

29. Plaintiff's male colleague, Herman, angrily yelled at Plaintiff on two separate occasions that as a woman she was not allowed to report issues with a "man's truck." Herman made explicit that his objection was based on Plaintiff's sex.

30. On March 25, 2024, Plaintiff reported Herman's conduct to Mr. Ciak via text message. Rather than addressing Herman's discriminatory behavior, Mr. Ciak instructed Plaintiff to text safety issues directly to him to avoid Herman being angered by a woman.

31. In other words, Defendant responded to sex-based harassment by imposing additional burdens and restrictions on Plaintiff that were not imposed on her male colleagues. Male switchers were permitted to report truck safety issues through normal channels without restriction. Plaintiff was required to use alternative

reporting methods specifically to avoid offending a male colleague who objected to taking direction from a woman.

32. This forced Plaintiff to become more covert in reporting safety violations, undermining her ability to do her job effectively and safely. When safety issues were not promptly addressed, Plaintiff was forced to drive trucks that did not meet DOT safety standards.

33. After this incident, Plaintiff felt she could no longer safely report harassment or safety concerns. She had now experienced Defendant's response to harassment from both external drivers and her own colleague—and in both instances, Defendant failed to protect her or take any corrective action against the harassers.

**Escalating Pattern of Disparate Treatment and Harassment**

34. Over the following months, Plaintiff's work environment continued to deteriorate. Defendant's complete failure to respond to her complaints became well known among her colleagues and the drivers with whom she worked.

35. This failure emboldened both groups to continue treating Plaintiff poorly because of her sex, as they understood there would be no consequences for their conduct.

36. Facility Manager Jacob Wilon explicitly instructed Plaintiff to "keep it in house" when she raised concerns, signaling that Defendant wanted to suppress rather than address her complaints.

37. By early 2025, Plaintiff's male colleague Anthony Marbury had become frustrated with the ongoing driver issues and decided to stop enforcing safety protocols to avoid confrontation with male drivers. When Plaintiff, on the other hand, continued to enforce required safety protocols—as was her job—drivers became increasingly hostile towards her.

38. When male drivers harassed or yelled at Plaintiff, Mr. Marbury would intervene by yelling at Plaintiff to "get back in the truck" so he could "deal with it." Mr. Marbury never yelled at male switchers or ordered them to get back in their trucks when dealing with problematic drivers.

39. This disparate treatment had devastating consequences for Plaintiff. When Mr. Marbury yelled at Plaintiff in front of hostile male drivers, it signaled to those drivers that they could disrespect and demean Plaintiff without consequence. Some drivers would smile and nod approvingly when witnessing Plaintiff being scolded. Other drivers would join in, also yelled at Plaintiff to "get back in the truck," as if she were a child being disciplined by the men.

40. The repeated public humiliation and undermining of Plaintiff's authority made it impossible for her to safely perform her job duties and placed her in greater physical danger.

**Plaintiff's Attempts to Escape the Hostile Environment**

41. On April 19, 2025, desperate to escape the hostile work environment, Plaintiff texted Manager Brian Ciak, Operations Manager Rhonda Kozma, and Facility Manager Jacob Wilson requesting a transfer to first shift or another location. She wrote: "I enjoy second shift and prefer it, but unfortunately it hasn't been great for certain things and working days should allow me to hopefully improve them. So even if it's at another close location, I am interested."

42. Mr. Ciak responded that they were "downsizing" and had no openings available. Plaintiff's request to transfer to escape harassment was denied.

43. On June 12, 2025, Plaintiff again attempted to transfer, this time requesting to move to third shift. She explained to Mr. Wilson that she could handle the entire third shift alone and noted "I've still been having issues with Anthony and maybe him having Bree would be beneficial for both her and myself."

44. Mr. Wilson acknowledged the idea was "not a bad idea" but indicated he needed to discuss it with Mr. Ciak. Plaintiff never received approval for the transfer. Her second attempt to escape the hostile environment through transfer was effectively denied.

**May 20, 2025 Sexual Assault**

45. On May 20, 2025, during Plaintiff's routine work duties, a male driver employed by GMT (a company contracted by RXO and GM) approached Plaintiff and stated "I need a hug."

46. Before Plaintiff could respond, the driver forcibly embraced her and held her tightly against her will. While restraining her, the driver repeatedly said "Show me some love, show me some love" as he forcibly caressed Plaintiff's body.

47. Plaintiff manage to temporarily escape by telling the driver she had seen a safety issue with his truck, causing him to release her. She attempted to get the attention of colleagues for help, but no one came to her aid.

48. The driver then renewed his assault by grabbing Plaintiff's shoulders and sexually caressing her back.

49. Plaintiff eventually escaped the driver's grasp. She was terrified, humiliated, and traumatized.

**May 23, 2025 Report of Sexual Assault and Defendant's Inaction**

50. Approximately three days after the assault, Plaintiff reported the incident to her colleague Anthony Marbury and to RXO Operations Supervisor Charles McDonald. She provided them with the exact time and location of the assault and informed them that a CCTV security camera was positioned to have captured the entire incident.

51. Despite having specific details that would enable investigation and corroboration of the assault, Defendant took no investigative action.

52. Defendant did not review the CCTV footage.

53. Defendant did not interview witnesses.

54. Defendant did not ban the driver form the facility.

55. Defendant did not report the assault to law enforcement.

56. Defendant took no action whatsoever in response to Plaintiff's report that she had been sexually assaulted while performing her job duties.

**May 30, 2025: Assailant Returns and Plaintiff Ordered to Hide**

57. On or about May 30, 2025, approximately one week after Plaintiff reported being sexually assaulted, the same driver who had assaulted her returned to the facility.

58. When Plaintiff saw her assailant had returned, she radioed Mr. Marbury for help and protection.

59. Rather than protecting Plaintiff or ensuring the driver could not access her, Mr. Marbury instructed Plaintiff to hide inside the GM facility building as far from the driver as possible.

60. Mr. Marbury then yelled at Plaintiff for making the issue "public" by radioing for help, even though she had used the radio specifically because she was in danger.

61. After speaking with the driver who had assaulted Plaintiff, Mr. Marbury dismissed and minimized the sexual assault. He told Plaintiff that he had "known guys like that before," the driver "didn't seem right in the head," and "He probably didn't mean anything by it and just took a liking to you."

62. In other words, rather than protecting Plaintiff from her assailant, Defendant's response was to: (a) require Plaintiff to hide; (b) reprimand her for seeking help; and (c) justify the assault by suggesting the driver "just took a liking" to Plaintiff.

63. Defendant allowed Plaintiff's assailant to continue working at the facility with unrestricted access to Plaintiff.

**June 18, 2025: Plaintiff's Final Complaint**

64. On June 18, 2025, while enforcing required safety protocols, Plaintiff was again yelled at by a male driver after she raised safety concerns about his trailer's tandems not being locked to the rear as required by GM facility rules.

65. Mr. Marbury arrived and, true to pattern, yelled at Plaintiff in front of the hostile driver to "get back in the truck" so he could "deal with it."

66. Emboldened by watching Mr. Marbury yell at and demean Plaintiff, the driver himself then yelled at Plaintiff to "get back in the truck," treating her like a subordinate being disciplined.

67. After nearly two years of harassment, after being sexually assaulted, after watcher her assailant return to the facility without consequence, and after being publicly humiliated yet again, Plaintiff finally broke down. At 5:45 PM, she called Mr. Ciak while crying and explained that the ongoing harassment had to stop and she did not feel safe to continue working that evening. She asked Mr. Ciak if she could go home to regroup. Mr. Ciak gave Plaintiff permission to leave work and agreed that she would complete a time correction form the next day when she returned. Plaintiff explicitly told Mr. Ciak that she would return to work the next day.

68. Plaintiff's phone records establish that this call occurred at 5:45 PM and lasted 4 minutes.

69. At 5:49 PM—only four minutes after Plaintiff called Mr. Ciak for permission to leave, and before Plaintiff had even left the facility—Mr. Marbury sent a text message to Facility Manager Jacob Wilson and another switcher stating:

> How you doing Jake this is I'm sorry to bother you. I know you said you had some issues with your family, but we got a problem with Jen. She decided to walk off the job. We had an issue with a driver in the back. I get back as a gym get back in your truck let me handle it. She says no and I said Jeg get back in the truck. I'll deal with this. She decided to walk off the job.

70. Mr. Marbury's text was false. Plaintiff had not "walked off the job," she had called Mr. Ciak and received express permission to leave.

71. Mr. Marbury sent this text before Plaintiff had even left the facility and without knowledge that Plaintiff had already obtained permission to leave.

72. At 9:10 PM that evening, after arriving home, plaintiff sent a detailed email to Mr. Ciak describing the events of that day and providing critical context that she had not been able to fully communicate during the tearful phone call hours earlier.

73. In her email, Plaintiff explained that Mr. Marbury "***would never yell at or order a male*** switcher to get back in his truck when dealing with a problematic driver" but routinely did so to her.

74. Plaintiff described how ***Mr. Marbury's conduct "shows the problematic driver that it is ok to yell at me, order me around and not respect me or the responsibility I have regarding GM rules or safety***. It also puts direct focus on me, instead of the actual problem at hand."

75. Plaintiff also stated: "In other words, instead of coming to back me up and simply make sure that the driver does what they are supposed to do, ***it turns into 2 men yelling at me by ordering me to basically take a hike so 'they' can deal with it***."

76. Plaintiff further explained:

> When this happens it is ***utterly humiliating. But again and more importantly, it teaches the driver how to treat me.*** The driver today after what Anthony said, felt so emboldened, he got out of HIS truck to confront me next

> to Anthony, ***putting me in more danger than I had been the entire time.*** When this happened I told the driver to backup or get back in his truck, but Anthony just repeated for me to get back in my truck, completely ignoring the other driver. ***So again, instead of this driver being addressed about GM policy, it became two men yelling at me and NOTHING to do with the real issue at hand. I have told Anthony on multiple occasions to not demean me in front of other driver and the problem and/or danger this puts me in.*** It always escalates the situations with drivers. In the long run especially.

77. Plaintiff also disclosed in this email for the first time to Mr. Ciak the details of the sexual assault: "There was a situation a couple of weeks ago when ***a driver decided to hug me and wouldn't let go even when I was trying to push him off. Even when I got away, he continued to try and touch me. It was a VERY uncomfortable situation and I didn't call Anthony because I already felt humiliated enough. I did not trust him to have my back. There is more to this but I don't even feel comfortable enough to talk about it***."

78. Plaintiff's email continued:

> In another situation a few weeks ago I saw a man who was not wearing a safety vest acting suspiciously walking in between trailers. RXO has explained before that no one is supposed to be walking in between those trailers in particular and especially with a safety vest on. When I went to go see who he was and that he needed a safety vest on, I found him peeing on a trailer. It shocked the both of us. I told him that he was not allowed in that area and that he needed a safety vest. When I realized he was the lawn staff I told him that I was sure the office would allow him to use the bathroom. ***It is no exaggeration to say that I was REAMED by Anthony over this and in his words I***

> ***should have "left the man alone" even though Anthony knows that no one is supposed to be walking between those area, especially on the yard without a safety vest***. Those are basic things that we enforce every single day. But because I accidentally found him peeing on a trailer, in Anthony's eyes, I was in the wrong and he absolutely let me know it.

79. Plaintiff's email concluded: "This has been happening long enough that for some time, ***it has beaten me down and I am begging to be put on a different shift***. I am more than capable of doing this job and I like where I am and this job overall, but it makes it dangerous and defeating to try and do the best job I can as it currently is."

80. Plaintiff sent this email to give Defendant one final opportunity to address the harassment, disparate treatment, and sexual assault she had endured.

**June 19, 2025: Huaman Resources Call and Immediate Termination**

81. On the morning of June 19, 2025, at 8:38 AM, Plaintiff received a call from Defendant's Human Resources representative, Jasmine Horton.

82. Ms. Horton asked Plaintiff to explain the email she had sent to Mr. Ciak the night before.

83. Plaintiff, hopeful that Defendant would finally take her complaints seriously and investigate, provided a detailed account of the harassment, disparate treatment, and sexual assault she had endured. She described incidents spanning nearly two years, including the sexual on May 20, 2025.

84. Despite Plaintiff's detailed disclosure of sexual assault, ongoing harassment, and discriminatory treatment, Ms. Horton asked Plaintiff only one substantive question: "The conversation you had with Brian. Did you say you recorded it?"

85. Ms. Horton showed no interest in investigation Plaintiff's reports of sexual assault or harassment. She did not ask about the details of the assault. She did not ask about the CCTV footage. She did not ask for the identity of the assailant. Her sole concern was whether Plaintiff had recorded her phone call with Mr. Ciak.

86. At 12:06 PM—less than four hours after Plaintiff spoke with Ms. Horton—Plaintiff received a phone call from Mr. Ciak and Operations Manager Rhonda Kozma.

87. Mr. Ciak stated: "HR has decided to terminate your employment."

88. Mr. Ciak did not provide any explanation for the termination.

89. Mr. Ciak did not mention any policy violation.

90. Mr. Ciak did not reference any performance issues.

91. Mr. Ciak did not discuss any of Plaintiff's reports of harassment or assault.

92. Mr. Ciak simply stated that HR had decided to terminate her.

93. Plaintiff was shocked and devastated.

94. At 12:39 PM, Plaintiff texted Ms. Horton requesting her complete personnel file. She received no response.

95. At 12:40 PM, Plaintiff sent an email to Ms. Horton requesting her personnel file. She received no response.

96. At 1:06 PM, Plaintiff texted Mr. Ciak requesting her personnel file.

97. Mr. Ciak directed Plaintiff to contact Regional Employee Relations Manager Gracian Bucu. Plaintiff left Mr. Bucu a voicemail and sent a follow-up email requesting her personnel file.

98. Defendant failed to provide Plaintiff's complete personnel file.

99. Plaintiff had never been disciplined, written up, or warned about any performance or conduct issues during her entire employment with Defendant.

100. Plaintiff was terminated solely because she complained to Defendant, through Mr. Ciak and Human Resources, about sex discrimination, harassment, and sexual assault.

**Defendant's Shifting and False Explanations**

101. After her termination, Plaintiff applied for unemployment benefits. Only then did Plaintiff learn that Defendant claimed the reason for her termination was "job abandonment" based on allegedly leaving the facility on June 18, 2025 without permission.

102. This explanation was demonstrably false. Plaintiff's phone records establish that she called Mr. Ciak at 5:45 PM on June 18, 2025 and spoke with him for 4 minutes before leaving the facility. During this call, Mr. Ciak gave Plaintiff permission to leave work.

103. Plaintiff's email sent at 9:10 PM that same evening thanked Mr. Ciak for "giving me this day off" and confirmed "As we talked about, I'll be in tomorrow."

104. Defendant created an Employee Corrective Action form dated June 18, 2025—after the fact—claiming Plaintiff had violated Category 3, Rule 28 of company policy: "Leaving the facility at any time without notification to a supervisor."

105. In unemployment proceedings, Defendant repeatedly asserted Plaintiff had "walked off the job" without permission. However, at the unemployment hearing held in October 2025, Mr. Ciak admitted under questioning that Plaintiff had in fact called him before leaving—directly contradicting Defendant's prior written statements that she had "left the facility during [her] scheduled shift and did not notify [her] supervisor."

106. On September 8, 2025, the Michigan Unemployment Insurance Agency reversed its initial determination and ruled in Plaintiff's favor, finding: "The new or additional evidence provided warrants a reversal in the prior determination. The

previous determination is reversed. You had not received prior warnings. Evidence has not been provided to establish misconduct."

107. Defendant's fabricated termination explanation is pretextual.

108. The true reason for Plaintiff's termination was her complaints about sex discrimination, harassment, and sexual assault.

**Pattern of Sex-Based Discriminatory Treatment**

109. Throughout her employment, Plaintiff was subjected to terms and conditions of employment that were materially less favorable than those provided to similarly situated male switchers because of her sex.

110. When Plaintiff enforced safety protocols with male drivers, she was routinely ignored, cursed at, and harassed. When her male colleagued enforced the same safety protocols with the same drivers, the drivers complied without incident.

111. When Plaintiff reported safety concerns about trucks, she was told by male colleague Herman that she was not permitted to do so because she was a woman, and management instructed her to sue alternative reporting methods to avoid angering her male colleague. Male switchers were permitted to report safety concerns through normal channels without restriction.

112. When Plaintiff needed assistance dealing with hostile drivers, Mr. Marbury would yell at her to "get back in the truck" and publicly scold her in front

of the drivers. Mr. Marbury never yelled at or publicly scolded male switchers when they dealt with problematic drivers."

113. When Plaintiff requested a shift change to escape the harassment in April and June 2025, her requests were denied or ignored. Male employees were not similarly forced to remain in shifts where they faced ongoing harassment.

114. When Plaintiff reported being sexually assaulted, she was instructed to hide from her assailant rather than being protected. Male employees would not have been required to hide from individuals who assaulted them while working.

115. These materially different terms and conditions of employment were imposed on Plaintiff solely because of her sex.

**COUNT I**
**HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

116. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

117. At all relevant times, Defendant was an employer with fifteen (15) or more employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

118. At all relevant times, Plaintiff was an employee of Defendant within the meaning of Title VII.

119. Plaintiff is a member of a protected class based on her sex (female).

120. Plaintiff was subjected to unwelcome harassment based on her sex, including but not limited to: (a) being called "bitch" and told to "fuck off" by male drivers because of her sex; (b) being physically intimidated by a male driver who removed his shirt and pushed his bare chest into her face to prove "what a big man" he was; (c) being ignored and disrespected by male drivers who would only comply with instructions when given by male colleagues; (d) being told by male colleagues she could not report safety issues because she was a woman; (e) being yelled at and publicly humiliated by Mr. Marbury in front of hostile drivers in a manner he never directed at male switchers; (f) being sexually assaulted by a male driver who forcibly embraced and caressed her; and (g) being required to hide from her assailant when he returned to the facility.

121. This unwelcome harassment was based on Plaintiff's sex. The harassment was explicitly gendered, with harassers making clear their conduct was motivated by Plaintiff being female.

122. This harassment was sufficiently severe and pervasive to alter the conditions of Plaintiff's employment and create an objectively and subjectively abusive working environment.

123. The harassment was objectively offensive such that a reasonable person in Plaintiff's position would find the work environment hostile and abusive.

124. Plaintiff subjectively perceived the work environment as hostile and abusive, as evidenced by her repeated complaints to management, her requests to transfer to different shifts, and her emotional distress.

125. Defendant is liable for the hostile work environment because it had actual knowledge of the harassment and failed to take prompt and appropriate corrective action.

126. Defendant had actual knowledge of the harassment through Plaintiff's repeated complaints, including: (a) her December 1, 2023 text message to Mr. Ciak reporting driver harassment and stating she felt unsafe; (b) her January 5, 2024 text message to Mr. Ciak reporting she felt unsafe working with a convicted sex offender; (c) her March 25, 2024 report of Herman's sex-based harassment; (d) her May 23, 2025 report of sexual assault to Mr. Marbury and RXO supervisor Charles McDonald; and (e) her June 18, 2025 email to Mr. Ciak detailing the ongoing harassment and sexual assault.

127. Despite actual knowledge of severe and pervasive sex-based harassment, Defendant failed to take any prompt or appropriate corrective action. Defendant did not investigate Plaintiff's complaints. Defendant did not discipline or counsel employees or drivers who harassed Plaintiff. Defendant did not modify Plaintiff's work assignments to protect her. Defendant did not review available

CCTV footage of the sexual assault. Defendant did not ban Plaintiff's assailant from the facility.

128. Defendant's only "response" to Plaintiff's complaints was to: (a) tell her to modify her own reporting procedures to avoid angering male colleagues; (b) tell her to "keep it in house"; and (c) ultimately terminate her employment when she persisted in reporting harassment to Human Resources.

129. Defendant did not exercise reasonable care to prevent and correct the harassment because Plaintiff did not unreasonable fail to take advantage of preventative or corrective opportunities. To the contrary, Plaintiff repeatedly reported harassment through available channels, and Defendant systematically failed to respond.

130. Defendant's actions were intentional, willful, malicious, and taken with reckless indifference to Plaintiff's federally protected rights.

131. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer economic damages, including lost wages, lost benefits, lost earning capacity, and loss of future employment opportunities.

132. As a further direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer non-economic damages,

including severe emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and loss of enjoyment of life.

133. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT II**
**DISCRIMINATION BASED ON SEX**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

134. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

135. Plaintiff is a member of a protected class based on her sex (female).

136. Plaintiff was subjected to adverse employment actions and terms and conditions of employment that were materially less favorable than those provided to similarly situated male employees.

137. Specifically, Defendant subjected Plaintiff to the following adverse and disparate treatment because of her sex: (a) imposing additional reporting restrictions on Plaintiff not imposed on male switchers, requiring her to text safety issues directly to management to avoid angering male colleagues; (b) allowing Mr. Marbury to routinely yell at and publicly demean Plaintiff in front of drivers in a manner he never directed at male switchers; (c) tolerating conduct by male colleagues who explicitly told Plaintiff she could not perform duties because she was a woman; (d) failing to transfer Plaintiff to safer shifts when requested despite acknowledging the

requests had merit; (e) requiring Plaintiff to hide from her assailant rather than removing the assailant's access to the facility; and (f) terminating Plaintiff's employment.

138. Defendant treated similarly situated male switchers more favorably.

139. Male switchers were not subjected to special reporting requirements.

140. Male switchers were not publicly yelled at and scolded by colleagues.

141. Male switchers were not told they could not perform job functions because of their gender.

142. Male switchers were not required to hide from individuals who threatened them.

143. Defendant's discriminatory treatment of Plaintiff was because of her sex.

144. But for Plaintiff's womanhood, Defendant would not have subjected her to these adverse terms and conditions of employment.

145. Defendant's actions were intentional, willful, malicious, and taken with reckless indifference to Plaintiff's federally protected rights.

146. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer economic damages, including lost wages, lost benefits, lost earning capacity, and loss of future employment opportunities.

147. As a further direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer non-economic damages, including severe emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and loss of enjoyment of life.

148. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees and costs.

149. At all relevant times, Defendant was an employer with fifteen (15) or more employees and Plaintiff was an employee covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

150. Plaintiff engaged in protected activity by complaining about gender-based discrimination and harassment to Defendant's management and Human Resources department, including her December 1, 2023, complaint to Brian Ciak, her January 2024 complaint about working with a driver convicted of sexual crimes, her March 2024 complaint about Herman's gender-based harassment, her May 23, 2025, report of sexual assault, and her June 18, 2025, email detailing the ongoing harassment and assault.

151. Defendant subjected Plaintiff to adverse employment actions, including termination of her employment on June 19, 2025.

152. There is a causal connection between Plaintiff's protected activity and the adverse employment action, as demonstrated by the close temporal proximity

between Plaintiff's June 18, 2025, complaint and June 19, 2025, conversation with Human Resources and her termination only hours later that same day.

153. But for Plaintiff's protected activity, Defendant would not have subjected Plaintiff to such adverse employment actions.

154. Defendant's actions were taken with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to punitive damages.

155. As a direct and proximate result of Defendant's actions, Plaintiff has suffered economic damages, including loss of earnings and employee benefits, impairment of her earning capacity, attorney's fees and costs, and will continue to suffer such damages in the future.

156. As a further direct and proximate result of Defendant's actions, Plaintiff has suffered non-economic damages, including emotional distress, mental anguish, loss of reputation, humiliation, and embarrassment, and will continue to suffer such damages in the future.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

157. Plaintiff incorporates by reference all allegations contained in the foregoing paragraphs as if fully set forth herein.

158. Plaintiff engaged in protected activity under Title VII by opposing discriminatory practices and complaining about sex-based harassment and discrimination to Defendant's management and Human Resources.

159. Plaintiff's protected activities include: (a) her December 1, 2023 complaint to Mr. Ciak about harassment by male drivers based on her sex; (b) her January 5, 2024 complaint to Mr. Ciak about being required to work alone with a driver convicted of sexual crimes; (c) her March 25, 2024 complaint to Mr. Ciak about colleague Herman's explicitly sex-based harassment; (d) her April 19, 2025 request to transfer shifts due to harassment; (e) her May 23, 2025 report of sexual assault; (f) her June 12, 2025 request to transfer shifts due to ongoing issues with Mr. Marbury's treatment of her; (g) her June 18, 2025 phone call to Mr. Ciak reporting ongoing harassment; (h) her June 18, 2025 email to Mr. Ciak detailing the pattern of sex-based harassment, disparate treatment, and sexual assault; and (i) her June 19, 2025 phone call with Human Resources detailing the pattern of sex-based harassment and disparate treatment.

160. Defendant subjected Plaintiff to the ultimate adverse employment action: termination of her employment on June 19, 2025.

161. A causal connection exists between Plaintiff's protected activity and the adverse employment action. Plaintiff was terminated only hours after speaking

with Human Resources on the morning of June 19, 2025 about her complaints of sex discrimination, harassment, and sexual assault detailed in her June 18, 2025 email.

162. The temporal proximity between Plaintiff's protected activity and her termination—a matter of hours on the same day—establishes a strong inference of causal connection.

163. Defendant's proffered reason for Plaintiff's termination—that she abandoned her job on June 18, 2025—is demonstrably false and pretextual.

164. Plaintiff's phone records prove she called Manager Ciak before leaving the facility, and Mr. Ciak gave her permission to leave.

165. Plaintiff's email sent that same evening thanked Mr. Ciak for "giving me this day off" and confirmed she would return the next day.

166. Defendant terminated no other employees for allegedly leaving work with supervisor permission.

167. The timing, the falsity of Defendant's stated reason, and the fact that HR showed interest only in whether Plaintiff had recorded her call (rather than investigating her assault complaints) establish that Defendant's true motivation for termination was retaliation for Plaintiff's protected complaints.

168. But for Plaintiff's protected complaints about sex discrimination and sexual assault, Defendant would not have terminated her employment.

169. Defendant's retaliatory conduct was intentional, willful, malicious, and taken with reckless indifference to Plaintiff's federally protected rights.

170. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and will continue to suffer economic damages, including lost wages, lost benefits, lost earning capacity, and loss of future employment opportunities.

171. As a further direct and proximate result of Defendant's unlawful retaliation, Plaintiff has suffered and will continue to suffer non-economic damages, including severe emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, and loss of enjoyment of life.

172. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT IV**
**HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT**

173. Plaintiff incorporates by reference all allegations contained in the foregoing paragraphs as if fully set forth herein.

174. At all relevant times, Defendant was an employer within the meaning of the ELCRA, MCL § 37.2201.

175. ELCRA prohibits an employer from discriminating against an individual with respect to employment because of sex. MCL § 37.2202(1)(a).

176. Plaintiff was subjected to sever and pervasive unwelcome harassment based on her sex as detailed in Paragraphs 119-128, *supra*, which altered the terms and conditions of her employment and created an abusive and hostile work environment.

177. Defendant knew or should have known of the harassment through Plaintiff's repeated complaints and failed to take prompt and adequate remedial action.

178. As a direct and proximate result of Defendant's violations of ELCRA, Plaintiff has suffered and will continue to suffer economic damages, including lost wages, lost benefits, lost earnings capacity, and loss of future employment opportunities.

179. As a further direct and proximate result of Defendant's violations of ELCRA, Plaintiff has suffered and will continue to suffer non-economic damages, including severe emotional distress, mental anguish, humiliation, embarrassment, and loss of enjoyment of life.

180. Plaintiff is entitled to compensatory damages, attorneys' fees, costs, and such other relief as permitted under MCL § 37.2801.

**COUNT V**
**DISCRIMINATION BASED ON SEX IN VIOLATION OF**
**MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT**

181. Plaintiff incorporates by reference all allegations contained in the foregoing paragraphs as if fully set forth herein.

182. ELCRA prohibits an employer from discriminating against an individual with respect to "compensation, terms, conditions, or privileges of employment" because of sex. MCL § 37.2202(1)(a).

183. Plaintiff, a female employee, was treated less favorably than similarly situated male employees with respect to the terms, conditions, and privileges of her employment.

184. As detailed in paragraphs 135-143 *supra*, Defendant subjected Plaintiff to materially different and less favorable working conditions than male switchers, including imposing special reporting restrictions on her, tolerating public humiliation and scolding of her by colleagues, permitting explicit statements that she could not perform job duties because of her sex, and denying her requests to transfer to safer working conditions.

185. Defendant's discriminatory treatment was based on Plaintiff's sex.

186. As a direct and proximate result of Defendant's sex discrimination, Plaintiff has suffered and will continue to suffer economic damages, including lost wages, lost benefits, lost earnings capacity, and loss of future employment opportunities.

187. As a further direct and proximate result of Defendant's sex discrimination, Plaintiff has suffered and will continue to suffer non-economic damages, including severe emotional distress, mental anguish, humiliation, embarrassment, and loss of enjoyment of life.

188. Plaintiff is entitled to compensatory damages, attorneys' fees, costs, and such other relief as permitted under MCL § 37.2801.

**COUNT VI**
**RETALIATION IN VIOLATION OF**
**MICHIGAN'S ELLIOTT-LARSEN CIVIL RIGHTS ACT**

189. Plaintiff incorporates by reference all allegations contained in the foregoing paragraphs as if fully set forth herein.

190. ELCRA prohibits retaliation against a person because that person has opposed a violation of ELCRA or made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under ELCRA. MCL § 37.2701.

191. Plaintiff engaged in protected activity by opposing sex discrimination and harassment, including through her complaints detailed in Paragraphs 158-160, *supra*.

192. Defendant terminated Plaintiff's employment on June 19, 2025.

193. Defendant's termination of Plaintiff was causally connected to her protected activity, as demonstrated by the termination occurring only hours after

Plaintiff reported sex discrimination, harassment, and sexual assault to Human Resources on the morning on June 19, 2025.

194. Defendant's proffered reason for termination—job abandonment—is false and pretextual, as established by objective evidence including phone records, email correspondence, and Mr. Ciaks's contradictory testimony at the unemployment hearing.

195. Defendant terminated Plaintiff in retaliation for her complaints about sex discrimination and harassment.

196. As a direct and proximate result of Defendant's retaliation, Plaintiff has suffered and will continue to suffer economic damages, including lost wages, lost benefits, lost earnings capacity, and loss of future employment opportunities.

197. As a further direct and proximate result of Defendant's retaliation, Plaintiff has suffered and will continue to suffer non-economic damages, including severe emotional distress, mental anguish, humiliation, embarrassment, and loss of enjoyment of life.

198. Plaintiff is entitled to compensatory damages, attorneys' fees, costs, and such other relief as permitted under MCL § 37.2801.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jennifer Walthorn respectfully requests that this Court enter judgment against Defendant and grant the following relief:

A. Declare that Defendant's practices and actions constitute unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act, MCL § 37.2102, *et seq*.

B. Award Plaintiff all lost wages, back pay, and front pay to which she is entitled;

C. Award Plaintiff compensatory damages for emotional distress, mental anguish, humiliation, embarrassment and other non-economic harm;

D. Award Plaintiff punitive damages;

E. Award Plaintiff reasonable attorney's fees, costs, and interest as provided by 42 U.S.C. § 2000e-5(k) and MCL § 37.2802;

F. Award Plaintiff pre-judgment and post-judgment interest; and

G. Award such other relief as this Court deems just and proper.

Respectfully Submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 847-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Dated: August 14, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JENNIFER WALTHORN,

Plaintiff,

v.

LOGISTICS INSIGHT CORP.,

Defendant.

Case No. 26-cv-10887

Hon. David M. Lawson

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 847-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Eric J. Pelton (P40635)
Thomas J. Davis (P78626)
KIENBAUM HARDY
VIVIANO PELTON & FORREST,
PL.C.
*Attorneys for Defendant*
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000
epelton@khvpf.com
tdavis@khvpf.com

**JURY DEMAND**

Plaintiff Jennifer Walthorn, by and through her attorneys, HURWITZ LAW PLLC, demands a trial by jury on the issues in the above-captioned cause of action.

Respectfully Submitted,

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)

Grant M. Vlahopoulos (P85633)
*Attorneys for Plaintiff*
340 Beakes St., Ste. 125
Ann Arbor, MI 48104
(844) 847-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com

Dated: August14, 2026